# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Teresa Lynn Paulling, | ) | Civil Action  No. 5:16-cv-3810-RMG-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Nancy A. Berryhill,[1] Acting Commissioner | ) | |
| of Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") pursuant to the Social Security Act ("the Act"). The issue before the court is whether the decision is supported by substantial evidence. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.    Relevant Background

       A.  Procedural History

       On February 11, 2014, Plaintiff applied for DIB alleging a disability onset date of June 1, 2009. Tr. 70; 88. Her applications were denied initially, Tr. 88-89, and upon reconsideration, Tr. 72-87. Plaintiff requested a hearing by an Administrative Law Judge ("ALJ"), Tr. 105-06, and Plaintiff appeared with her attorney at a hearing on June 9, 2016, Tr. 37-58. The ALJ issued a

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes Nancy A. Berryhill for Carolyn W. Colvin as Defendant in this action.

decision on August 9, 2016, finding Plaintiff was not disabled. Tr. 15-31. Plaintiff sought review by the Appeals Council. Tr. 12-14. On November 7, 2016, the Appeals Council denied the request for review, thereby making the ALJ's decision the Commissioner's final administrative decision for purposes of judicial review. Tr. 1-6. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on December 5, 2016. ECF No. 1.

### B. Plaintiff's Background

Plaintiff was born on February 1, 1962, and was 47 years old as of her alleged onset date of June 1, 2009. Tr. 215. Plaintiff completed high school, college, and earned a Master's Degree. Tr. 41; 227. Plaintiff's past relevant work ("PRW") included teacher/special-needs teacher. Tr. 218; 227. In her Disability Report-Adult Plaintiff indicated that she stopped working on May 31, 2009, because her medical conditions of major depressive disorder and ADHD prevented her from working. Tr. 226.

### C. The Administrative Hearing

#### 1. Plaintiff's Testimony

Plaintiff and her attorney appeared at her administrative hearing on June 9, 2016, along with Vocational Expert ("VE") Arthur Schmidt. Tr. 37-58. Plaintiff was 54 years old on the date of her hearing. Tr. 41. Plaintiff confirmed the alleged onset date of June 1, 2009. *Id.* Plaintiff testified she has a Master's Degree in Education from College of Charleston. *Id.* Additionally, Plaintiff testified she has two daughters—one is 20 years old and one is 16 years old with moderate-ranged autism. Tr. 41-42. Plaintiff testified she is divorced. Tr. 42. Plaintiff testified that she lives in a house with her younger daughter and 58-year-old sister. *Id.*

Plaintiff testified she is five-feet-two-inches tall and weighs 110 pounds—which Plaintiff indicated is her normal weight—and is right handed. Tr. 42-43. Plaintiff testified she has a driver's license and drives about twice a week. Tr. 43. Specifically, Plaintiff testified she drives

her daughter to therapy on Mondays and drives herself to counseling on Thursdays. *Id.* Plaintiff testified she has never served in the military and smokes "three or four" cigarettes a day. *Id.* Plaintiff testified she drinks very little alcohol and does not use illegal drugs. *Id.* Plaintiff testified she does not experience side effects from her medications. Tr. 43-44.

When asked to describe her work at Sunrise Children's School, Plaintiff testified she "was the lead teacher of the two-year-olds. And the classroom was run just like a preschool classroom would be, with a circle time, and centers, and closing circle. [She] did have an assistant." Tr. 44. When asked about her current income, Plaintiff testified she receives $1,150 in alimony and $950 in child support per month. *Id.* Plaintiff testified she has not collected unemployment benefits since June 1, 2009. *Id.* The ALJ indicated that evidence showed Plaintiff had income in 2009, 2010, and 2011, and Plaintiff answered that she worked for an elderly couple—she cooked and cleaned for them, and on occasion "cleaned his daughter's house." *Id.* Plaintiff testified that she no longer works for the couple but cleans once a month for two difference people. *Id.* Plaintiff clarified that she still cleans when she is called. Tr. 45-46.

Plaintiff testified that she gets up in the morning anywhere from 6:30 to 8:30 or 9:00 and goes to bed anywhere between 10:00 and 11:00. Tr. 45. When asked what she is required to do for her daughter, Plaintiff testified:

> Fortunately, I have a lot of help with her. She - - I have to keep the house clean so that when her therapists or caregivers come, the environment is healthy and safe. My sister does a lot of the cooking. I try. I do prepare lunches. She does most of the evening meals. Or she'll come up and help me with - - if I'm cooking I get a little bit distracted and have a hard time pulling it together. So she picks up on that, thank goodness, and she will help me, in my need, in the kitchen.

*Id.*

Plaintiff testified that she will make lunches on her own and "get everything out of the refrigerator, and end up [] mak[ing] maybe two of whatever I'm making, or three, so that I don't

have to go through it the next day." Tr. 45-46. When asked to clarify what she specifically does to help her daughter, Plaintiff testified that she "keep[s] her prepared for the people that are in her lives (sic)" and does a lot of toileting issues—she makes "sure that [her daughter] uses the toilet on an hourly basis." Tr. 46. Additionally, Plaintiff testified that she bathes, goes on walks with, and reads to her daughter. *Id.* She testified she likes to have her daughter with her while she shops for groceries. *Id.* Plaintiff testified that she grocery shops twice a month, and her sister will pick up items she forgot to buy. *Id.*

Upon questioning by her attorney, Plaintiff testified that she is unable to return to work at this time (the time of the hearing) because: "I am extremely distracted whenever I try to do something, whether it's cook lunch or do the laundry. It seems everything is half done, half finished. I have a really hard time focusing. Maybe that's the same thing as being distracted. I don't enjoy being around people much anymore." Tr. 46. Plaintiff testified that when she is around too many people she feels like they are closing in on her—which her doctor describes as anxiety. Tr. 47. Further, Plaintiff testified she takes half an anxiety tablet whenever she leaves the house. *Id.* Additionally, Plaintiff testified that she will feel shaky and nervous around other people and feels like others are "looking at [her] like something's wrong, or why don't you take care of your child, you know." *Id.*

When asked if her condition has affected her ability to focus, Plaintiff responded: "absolutely. . . I feel like I live in a tunnel, sometimes, that I can't get out of in order to do what is expected of me, whether at home, or in the car. . . ." *Id.* Plaintiff testified she has trouble being in the present—that she does not notice "what's here and now." *Id.* Plaintiff testified that as a result of this her daughter gets out of the house a lot. *Id.* Plaintiff testified her daughter left the house without her knowing about it "[j]ust the other day." Tr. 47-48. Plaintiff testified she does

not take her daughter places, and that "other people take her places." Tr. 48. However, Plaintiff testified that she will take her daughter with her while she is grocery shopping. *Id.*

When asked how she was doing at finishing things she starts, Plaintiff testified: "I've got all kind of little things that I like to do, and I try to do, and they're half done." *Id.* Further, Plaintiff explained that she has been unable or delayed in hemming some pants for her daughter because her sewing machine has been broken for a long time. Tr. 48-49. Additionally, Plaintiff testified she will start a task and then worry about her daughter or worry that there is something else she should be doing and that "anything will distract [her]." Tr. 49.

When asked how she handles stress, Plaintiff testified: "I shut down. . . .I don't eat real well. . . .I'm kind of irritable when I'm stressed." *Id.* Plaintiff testified that stress will overwhelm her, even everyday stress. Tr. 49-50. Plaintiff explained that her therapist described her reaction to stress as Plaintiff living "with just a certain part of [her] brain open, and that's the part of the brain that solves major problems. It's like when you go into shock or something happens that is way out of the ordinary. Or, you know, like a tragedy thing." Tr. 50. Plaintiff testified that she is always in crisis mode. *Id.* Plaintiff testified that "everything is a plan, whether it's to pay the bills or to go on a walk. It probably takes [her] 20/30 minutes to get out the house just to take a walk." *Id.* In order to function, Plaintiff explained that she has a lot of people who "carry [her] through the day, and through the night, even." *Id.*

To reduce stress, Plaintiff testified that she goes to weekly counselling, and that her therapist helps her see that she is a good mother to her daughter. Tr. 51. Further, Plaintiff testified that her therapist is very positive, helps her minimize negative thoughts and keep her life as basic as possible. *Id.* When asked if she would be able to handle going back to work, Plaintiff testified that she "can't think about it," and could not be in a classroom. Tr. 52. Further, Plaintiff testified that she does not think she could do the little things that she does to keep their lives

running—that she would not be able to do both. *Id.* Plaintiff testified that she feels like she is doing the best she can, and she already has "a lot of help." *Id.*

### 2. Testimony of VE

VE Schmidt also testified, without objection, at the administrative hearing. Tr. 53. He noted that Plaintiff's past work included work as a "teacher, DOT of 091.227-010, [SVP of] 7, skilled, [and] light." *Id.* The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and PRW with the following limitations:

> No exertional limitations. Limited to unskilled work. No ongoing interaction with the public. No team type interaction with co-workers. Incidental contact is allowed. No production pace work - - example, assembly line. Can perform goal-oriented work - - example, cleaner.

Tr. 54. The VE testified with those restrictions the individual would be unable to perform Plaintiff's PRW, but there would be work available for a "packer," with a DOT of 920.687-134, SVP of 2, unskilled, medium exertional level. Tr. 55. There would be 1,982 packer jobs in the state of South Carolina, and 360,000 jobs nationally. *Id.* Additionally, the VE testified this individual could perform work as a "laundry operator," with a DOT of 361.685-014, SVP of 2, unskilled, medium exertional level, with 3,190 jobs in the state of South Carolina and 211,000 jobs nationally. *Id.* The ALJ posed a second hypothetical modifying hypothetical number one with an additional limitation of unable to maintain concentration, persistence or pace in two-hour segments to complete an eight-hour day. *Id.* The VE testified that such an individual could not perform Plaintiff's PRW or any work and would be unemployable. *Id.* Plaintiff's attorney had no questions for the VE. Tr. 56.

## II. Discussion

### A. The ALJ's Findings

In her August 9, 2016, decision, the ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2015.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2009 through her date last insured of September 30, 2015 (20 CFR 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: depression not otherwise specified, attention deficit hyperactivity disorder (ADHD) inattentive type, and an anxiety disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels, but with the following non exertional limitations. She was limited to unskilled work defined as performing simple, routine and/or repetitive tasks in two-hour increments with customary breaks to complete an eight-hour workday. She was further limited to no ongoing interaction with the public and no team-type interaction with coworkers. However, incidental contact with both the public and coworkers is allowed. Although the claimant was precluded from production-pace work, such as work on an assembly line, she could perform goal-oriented work (e.g. cleaner).

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on February 1, 1962 and was 53 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).[2]

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

---

[2] The regulations define age 50-54 as a "person closely approaching advanced age." 20 CFR 404.1563(d). This category change has no impact on a finding of not disabled under the Medical-Vocational Guidelines. 20 CFR Part 404, Subpt. P, App. 2.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2009, the alleged onset date, through September 30, 2015, the date last insured (20 CFR 404.1520(g)).

Tr. 20-31.

    B.  Legal Framework

        1.  The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

    inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he/she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

(4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146. n.5 (regarding burdens of proof).

### 2. The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party. . . ." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try [these cases] de novo, or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157-58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

III.    Analysis

Plaintiff asserts that the ALJ's findings regarding the opinion evidence of record do not rest on substantial evidence. Pl.'s Br., ECF No. 18. Plaintiff argues that even though the ALJ laid out the relevant criteria, she then "generically assigned 'great weight' to the state chart reviewers' opinions as 'well supported.'" *Id.* at 9. Further, Plaintiff maintains the ALJ dismissed certain treating physicians' opinions and improperly assigned partial weight to other opinions. *Id.* at 10. The Commissioner disagrees, and asserts that the record demonstrates that Plaintiff's impairments were mild and medication was successful in reducing her symptoms. Def.'s Br., ECF No. 20. Further, the Commissioner maintains "[t]he ALJ gave the appropriate weight to the medical opinions of record based on their consistency with the record as a whole and the underlying evidence." *Id.* at 1.

If a treating source's medical opinion is "well-supported and 'not inconsistent' with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence). The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *See* 20 C.F.R. §§ 404.1527(c)(2). However, "the rule does not require that the testimony be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician

and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005); 20 C.F.R. § 404.1527(c). The rationale for the general rule affording opinions of treating physicians greater weight is "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Johnson*, 434 F.3d at 654 (quoting *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001)). The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro*, 270 F.3d at 178. SSR 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. In undertaking review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence.

### A. Weight afforded to consultative opinions

In this matter, the ALJ considered the opinions of the state agency consultants. Tr. 27-29. She noted that the "opinions are entitled to weight and must be evaluated as those of non-examining, but highly qualified experts." Tr. 26. After giving the opinions full consideration, the ALJ gave them "great weight" noting they were "well-supported by the claimant's treatment history." *Id.* Although the ALJ gave the opinions great weight she noted: "I am also mindful that the medical consultants last evaluated the claimant on January 2, 2015 (Exhibits 4A-6A). Based upon the claimant's testimony and her recent treatment history, I have adjusted the claimant's accommodations to fully account for her limitations as will be discussed below." Tr. 27. The ALJ then discussed the opinions of the consulting physicians and Plaintiff's treating physicians.

The ALJ afforded weight to the three examining medical consultant opinions. Tr. 27-29. First, the ALJ considered the May 29, 2014 consultative examination by Dr. Harriett Steinert. Tr. 27. Noting that Dr. Steinert diagnosed Plaintiff with depression, anxiety, and ADHD, the ALJ found that Dr. Steinert "assessed [Plaintiff] with no sensory or motor deficits before noting that [Plaintiff] was fully oriented to person, place and time." *Id.* Further, the ALJ noted Dr. Steinert's finding that Plaintiff has "no limitations" regarding her capacity to work. *Id.* The ALJ gave "great weight" to Dr. Steinert's opinions concerning Plaintiff's physical limitations, but she assigned "little weight" to Dr. Steinert's opinions concerning Plaintiff's mental impairments because Dr. Steinert diagnosed Plaintiff with mental impairments, "but without accompanying mental limitations." *Id.*

The ALJ also considered a June 18, 2014 consultative examination completed by Dr. Cashton Spivey. Tr. 27. There, the ALJ noted that Dr. Spivey assessed Plaintiff with "fair to good insight and judgment, fair to good attention and concentration, and with a score falling within normal limits." Tr. 27. Further, the ALJ found that Dr. Spivey opined that Plaintiff is capable of understanding simple and complex instructions as well as performing simple and complex tasks in the workplace. *Id.* The ALJ assigned little weight to Dr. Spivey's opinion about Plaintiff having "difficulty with persistence due to problems with attention and concentration," because it was based on Plaintiff's "subjective 'complaints.'" *Id.* However, the ALJ assigned great weight to Dr. Spivey's "normal findings and largely unremarkable MMSE." *Id.*

Finally, the ALJ considered the December 2, 2014 consultative examination of Dr. John Custer. Tr. 27-28. The ALJ noted Dr. Custer's findings that Plaintiff "answered questions in a rambling and circumstantial manner, was anxious and jittery during the exam, and was mildly dysthymic." Tr. 28. Based on this observation, the ALJ found Dr. Custer opined that Plaintiff's ADHD was not adequately treated or she had a bipolar diathesis. *Id.* Dr. Custer further opined

that Plaintiff could perform other work if her "impairments were properly treated with medications." *Id.* Therefore, the ALJ gave Dr. Custer's opinions "partial weight" based on Plaintiff's "high performance during her diagnostic testing, contrasted with her anxious and rambling speech." *Id.*

After thoroughly reviewing the consultative examinations, the undersigned finds that substantial evidence supports the ALJ's findings regarding them. First, concerning the weight she afforded Dr. Steinert's opinions, the undersigned finds that the May 29, 2014 consultative examination supports the ALJ's findings. In her examination report, Dr. Steinert found Plaintiff has both ADHD and depression and takes prescription medication for both impairments. Tr. 356. Further, she found that Plaintiff has not been hospitalized for either condition but sees a therapist. *Id.* After noting Plaintiff's current medications, Dr. Steinert described Plaintiff as "well-nourished [and] well-developed [with] no acute distress." Tr. 356-57. Further, Dr. Steinert indicated that Plaintiff was neatly groomed, was able to provide her medical history, but had a "flat affect and seemed very anxious." Tr. 357. All of Plaintiff's "neurologic" ratings were normal, and Dr. Steinert found Plaintiff could count to ten and back; could count by 3s; was oriented to person, place and time; and was capable of handling personal financial and legal matters. Tr. 358-59. Though Dr. Steinert diagnosed Plaintiff with "[d]epression and anxiety; ADHD," she found Plaintiff "has no limitations." Tr. 359.

Turning to Dr. Spivey's evaluation, the undersigned notes that Dr. Spivey found Plaintiff would have difficulty with persistence in the workplace "due to her complaints of attention/concentration problems." Tr. 363. This was the only area where Dr. Spivey assigned a "difficulty" rating, and this was the only opinion the ALJ discounted because, as clearly indicated in his report, it was based on Plaintiff's subjective complaints. Tr. 361-63. According to Dr. Spivey's test results, Plaintiff's MMSE score was 29 out of 30 which fell within normal

limits; she was oriented to time, place, and person; she was able to perform serial 7's; she was able to recall 2 of 3 objects at 5 minutes; her language skills were intact; she was able to follow a 3-step command, and accurately reproduce a drawing; and she demonstrated a satisfactory general fund of information and intact abstract reasoning. Tr. 362. Further, Dr. Spivey found Plaintiff's insight and judgment to be "fair to good." Tr. 363. Though Dr. Spivey described Plaintiff's mood as "mildly sad," he found her thought processes were logical and coherent. *Id.* Further, he found her "attention/concentration functioning ranged from fair to good." *Id.* Based on his own independent observations concerning Plaintiff's attention and concentration function, the undersigned finds the one area of Dr. Spivey's opinion that the ALJ discounted— attention/concentration problems—was supported by other evidence in the June 18, 2014 evaluation.

Finally, the undersigned finds substantial evidence supports the ALJ's consideration of Dr. Custer's December 2, 2014 Mental Status Examination. Tr. 483-86. In Dr. Custer's Examination, he noted that Plaintiff was regularly being treated by Dr. Wilcox, and Plaintiff found the treatment to be "quite helpful." Tr. 484. Additionally, Dr. Custer noted that Plaintiff meets with Mary Price for counseling. *Id.* Further, after noting Plaintiff's current medication regimen, Dr. Custer indicated that Plaintiff feels like her "medications and counseling have been helpful," though she still reports experiencing depressed moods. *Id.* Dr. Custer considered Plaintiff's daily activities which include: getting her daughter off to school; doing chores; spending time with her daughter after school; doing laundry; and doing work at her desk. *Id.* The following information was noted in this Mental Health Examination:

> [Plaintiff] answered questions in a somewhat rambling and circumstantial manner. If you allowed her to she would just continue rambling on, and she would often continue talking even after she had answered the question at hand. She seemed anxious and jittery, but at the same time her affect was mildly dysthymic. There

was no evidence of any psychosis and she denied any suicidal or homicidal ideation.

On the cognitive exam, [Plaintiff] was alert and fully oriented. She was able to name the current president and past presidents back to Bush senior, omitting Clinton. She was able to name the Governor of South Carolina. She was able to remember 3 out of 3 objects immediately and 3 out of 3 objects after 5 minutes. She was able to spell the word "world" forward and backwards. She was able to follow a 3-stage command and copy a geometric design. On the Folstein Mini-Mental Status Exam, she scored a 30 out of 30.

Tr. 484-85. Dr. Custer diagnosed Plaintiff with the following: Unspecified depressive disorder; *possible* [ADHD]; and *possible* unspecified anxiety disorder. Tr. 485 (emphasis added). In the Prognosis section of the examination, Dr. Custer found:

[Plaintiff] has symptoms, which would seem to cross diagnostic boundaries, and therefore *giving any exact diagnosis and prognosis in a [Plaintiff] such as this would be extremely difficult*. From the medical records I have, it would appear as though [Plaintiff] has been maintained on 2 base medications of Wellbutrin and Focalin, and other medications have been added or subtracted to that. It may be worthwhile to try her on other base medications to determine if better symptom control could be created. Given her rambling and circumstantial speech, it is not clear whether she was just nervous about this exam, is anxious in general, her ADHD is not being adequately treated, or whether she even has a bipolar diathesis. Nevertheless, she was able to have a perfect score on the Mini-Mental status exam. It could be that the additional stress in her personal and family life was too much for her to handle along with work stress. *She maybe able to perform some other type of work*, but she should have medication issues noted above addressed first. I would say that she is able to manage her own finances.

Tr. 485-86 (emphasis added).

Concerning this examination, the ALJ noted many of Dr. Custer's findings. Tr. 27-28. The ALJ expressed concern over Dr. Custer's finding that Plaintiff was not being properly medicated. Based on this finding by Dr. Custer, the ALJ indicated that with proper medication, Plaintiff could perform other work (a specific finding of Dr. Custer). The ALJ considered Plaintiff's high performance scores on her diagnostic testing which is objective evidence on which the ALJ could base her findings. The undersigned finds substantial evidence supports the "partial weight" the ALJ assigned to Dr. Custer's findings. Mainly, the undersigned finds many

of Dr. Custer's opinions to be inconclusive and vague. Importantly, Dr. Custer notes that assigning Plaintiff an exact diagnosis *"would be extremely difficult."* Further, Dr. Custer indicates Plaintiff has *possible* ADHD and *possible* unspecified anxiety disorder. Overall, the ALJ took into account all of Dr. Custer's findings in her consideration of his examination. Therefore, the undersigned recommends affirming the ALJ's consideration of all consultative opinions.

        B.  Weight assigned to treating physician opinions.

The undersigned finds the ALJ thoroughly considered and assigned appropriate weight to opinions of Plaintiff's treating physician. In her Order, the ALJ recounted Plaintiff's history with Dr. Michael Wilcox and noted that Plaintiff has regularly seen Dr. Wilcox for psychiatric treatment from May 9, 2012, to October 23, 2014. *Id.* The ALJ summarized Plaintiff's treatment with Dr. Wilcox from the following dates or date ranges: May 9, 2012; December 20, 2012; January 17, 2013; March 14, 2013; May of 2013; August 22, 2013; October 17, 2013; February 27, 2014; June 19, 2014; September 4, 2014. Thereafter, the ALJ thoroughly reviewed Dr. Wilcox's treatment notes from June 24, 2014, and October 30, 2014, giving great weight to his June 2014 opinion. Tr. 28. As the ALJ documented, in his June opinion, Dr. Wilcox found Plaintiff's prescription medications had helped her mental condition, and he further assessed that Plaintiff had "full orientation, adequate attention/concentration, and adequate memory." *Id.* Further, the ALJ noted that Dr. Wilcox "assessed [Plaintiff] with distractible thought process, appropriate thought content, worried/anxious as well as depressed mood/effect." *Id.* The ALJ gave "great weight" to Dr. Wilcox's opinion that "[Plaintiff] had good ability to complete basic activities of daily living, adequate ability to relate to others, good ability to complete simple, routine tasks, but with only adequate ability to complete complex tasks." *Id.* In her reasoning for

assigning great weight to this opinion of Dr. Wilcox's, the ALJ indicated "it [was] consistent with his treatment history of [Plaintiff]." *Id.*

However, the ALJ gave no weight to Dr. Wilcox's October 30, 2014 opinion. *Id.* There, as the ALJ recited, Dr. Wilcox "opined that [Plaintiff] had marked restriction in activities of daily living, marked difficulties in maintaining social functioning, and deficiencies in concentration resulting in frequent failure to complete tasks in a timely manner." *Id.* The ALJ found this opinion was "in complete contrast with his prior treating source statement, which noted that [Plaintiff] had good ability to complete daily activities and tasks." *Id.* Additionally, the ALJ found "Dr. Wilcox's second treating source statement conflicts with his treating notes during the same period indicating that [Plaintiff] was benefitting from treatment with [Plaintiff] report[ing] she was 'doing well overall and good with therapy.'" *Id.*

After thoroughly reviewing Dr. Wilcox's treatment notes, the undersigned finds that substantial evidence supports the ALJ's findings regarding them. In her first encounter with Dr. Wilcox, Plaintiff complained of depression and problems with focus and concentration; poor task completion; and problems with "avoiding work." Tr. 365. Dr. Wilcox noted that Plaintiff's daughter and marriage contributed to her report of experiencing stress. *Id.* In this encounter, Dr. Wilcox assigned Plaintiff with "mild" panic/anxiety and "good" judgment. *Id.* In his treatment notes from June 13, 2012, Dr. Wilcox indicated that Plaintiff was experiencing "good" concentration and focus and that Plaintiff stated she had "good mood control and anxiety." Tr. 366. Additionally, Dr. Wilcox noted that Plaintiff was better at "writing grants," planned a trip to see her father, and may have a job in advertising/sales. *Id.* Treatment notes from July 11, 2012, indicate Plaintiff is "doing well overall and benefit[ting] from meds." Tr. 368. Though Plaintiff expressed anxiety about being on her own, she also reported "better interactions with children." *Id.* Additionally, Dr. Wilcox noted that Plaintiff reported "improved productivity." *Id.* Treatment

notes from Plaintiff's August 1, 2012 encounter also show "improvement in ADD," and indicate Plaintiff reported she is "doing well overall." Tr. 369. Additionally, Plaintiff reported she has good control of anxiety and mood. *Id.* Treatment notes from September 27, 2012, indicate Plaintiff and husband had a recent altercation causing Plaintiff "shock about [the] events." Tr. 370. Though Plaintiff reported increased anxiety, treatment notes indicate she was "doing well overall" and benefitting from her medication. *Id.* In treatment notes from December 20, 2012, Plaintiff reported experiencing ongoing stress from her separation. Tr. 371. Additionally, the report indicates Plaintiff began taking Lexapro for her "poor mood." *Id.* Plaintiff reported she was benefiting from taking her medication and stated her "job [was] going well." *Id.*

Treatment notes beginning on January 17, 2013, show continued improvement. Tr. 372. In this medical encounter Plaintiff stated she was "doing well overall" and was appropriately handling stress. *Id.* Additionally, Plaintiff reported continued benefits from her medications, and she stated she had "good" concentration and focus which was a "benefit for writing." *Id.* Plaintiff reported she was continuing to adjust to the separation. *Id.* Dr. Wilcox reported Plaintiff had "improving anxiety and mood despite stressors." *Id.* In a medical encounter from March 14, 2013, Plaintiff reported increased stress because her sister moved into her home. Tr. 373. However, Plaintiff reported medication was helping with her anxiety, mood, and ADD. *Id.* Dr. Wilcox reported that though Plaintiff had increased stressors, she had "good control overall." *Id.* A May 30, 2013 encounter demonstrates Plaintiff was experiencing increased depression and problems with "mood." Tr. 374. However, Plaintiff indicated she had "control of anxiety." *Id.* Though Plaintiff reported her depression medication was not as effective, she reported her medication helps her have "good control" of her ADHD. *Id.* On June 28, 2013, Plaintiff reported her mood and depression had improved with Lexapro, and she was continuing to experience benefits for concentration and focus with Focalin. Tr. 375. Additionally, Plaintiff stated she was

continuing to "look for job opportunities." *Id.* Dr. Wilcox assessed Plaintiff with "[i]mproved mood and depression but ongoing prob[lems] with social stressors." *Id.* In an August 22, 2013 medical encounter, Plaintiff stated she was "doing well overall" and responding well to medications. Tr. 376. Plaintiff reported that she is feeling better at a higher dosage of Lexapro and with "child going to school." *Id.* Additionally, Plaintiff indicated she was looking for a job and contract work and was "considering applying [for] school jobs." *Id.* Dr. Wilcox assessed Plaintiff with an improved mood and depression but ongoing problems with social stresses and "late day ADD." *Id.* In her medical encounter from October 17, 2013, Plaintiff reported she was "doing well overall" but having some problems with organization. Tr. 377. Plaintiff indicated that she was coping well with stressors; denied depression; and had "good mood control." *Id.* Further, Plaintiff stated she had "better self confidence;" was continuing to be active and social; was writing again; and was benefiting from her medication. *Id.* Dr. Wilcox assessed Plaintiff with "good control of mood and depression despite prob[lems] [and] social stressors." *Id.*

In her first two medical encounters of 2014, Plaintiff reported ongoing stress and problems with depression and motivation. Tr. 378-79; 489. On February 27, 2014, Plaintiff reported improvements after taking Cymbalta and Wellbutrin. Tr. 380. Additionally, she reported she had better interactions with others and less anxiety. *Id.* Additionally, Plaintiff indicated that she had "started process of disability." *Id.* Dr. Wilcox assessed Plaintiff with "improving mood and anxiety, better functioning and attitude. . . ." *Id.* On March 27, 2014, Plaintiff reported ongoing problems with focus and concentration and coping with stressors. Tr. 381. Dr. Wilcox assessed Plaintiff with "fair functioning and attitude [but] ongoing stress. . . ." *Id.* On April 24, 2014, Plaintiff reported that she was overwhelmed at times "but managing well." Tr. 382. She also reported fatigue and ongoing anxiety. *Id.* Dr. Wilcox found Plaintiff was "doing fair overall and coping. . . ." On May 22, 2014, Plaintiff reported she was "fair overall," but had continuing

problems with energy and anxiety. Tr. 383. Additionally, Plaintiff stated she was overwhelmed and tearful. *Id.* Dr. Wilcox found Plaintiff was "fair overall" but struggles with sadness. *Id.* On June 3, 2014, Plaintiff reported she was "fair overall" but continued to experience problems with energy and anxiety and was easily overwhelmed. Tr. 384. Again, Dr. Wilcox reported that Plaintiff was fair overall but struggled with sadness and was overwhelmed. On June 19, 2014, Plaintiff reported she was "fair overall" but had increased with anxiety and was overwhelmed. Tr. 385. Dr. Wilcox found Plaintiff had ongoing anxiety and moodiness. *Id.* On December 18, 2014, Plaintiff reported she was "doing well overall" and had a good experience in therapy with Mary Price. Tr. 490. However, Plaintiff again reported ongoing anxiety and stress. *Id.* Dr. Wilcox found Plaintiff was "fair overall [with] ongoing social stressors." *Id.*

Medical records from 2015 indicate continued improvements and setbacks. Tr. 491-500. Often Plaintiff reported she was doing well overall and was good with her current medication regimen. In her last medical encounter, Plaintiff reported she was "doing fair overall and coping with daily stressors." Tr. 503. Dr. Wilcox reported that Plaintiff was "doing well overall and good with med[ications]." The undersigned finds that Plaintiff's medical notes demonstrate Plaintiff experienced improvements and setbacks throughout the course of her treatment. The undersigned notes that during the time period of Plaintiff's treatment, she was going through a separation and divorce. Plaintiff often reported feeling "good" or "fair" overall. Plaintiff also showed an equal amount of advances and setbacks. In all of his treatment notes, Dr. Wilcox found Plaintiff had "good" compliance, energy, interest, and sociability; "good" or "fair" concentration, "good" or "fair" appetite; "mild" anxiety, "clear" thoughts, and denied panic. *Id.*

The responsibility for weighing evidence falls on the Commissioner, not the reviewing court. *See Craig v. Chater*, 76 F.3d at 589. The ALJ has the discretion to give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*,

270 F.3d at 176. SSR 96-2p requires that an unfavorable decision contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. As required by SSR 96-2p, the ALJ's decision contained specific reasons for the weight given to Dr. Wilcox's assessments. The undersigned finds the ALJ's reasoning was based on a complete review of years of Plaintiff's medical treatment with him.

The court is not to weigh evidence or substitute its judgment for that of the Commissioner, but is to determine whether the ALJ's weighing of the evidence is supported by substantial evidence in the record. *See generally Hays v. Sullivan*, 907 F.2d at 1456 (noting judicial review limited to determining whether findings supported by substantial evidence and whether correct law was applied). Because the undersigned finds the ALJ's weighing of Dr. Wilcox's findings and assessment is supported by substantial evidence, the undersigned recommends affirming this matter.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the undersigned finds that the Commissioner performed an adequate review of the whole record and the decision is supported by substantial evidence. Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under the Act, it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

December 15, 2017                                          Kaymani D. West
Florence, South Carolina                                 United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**